STATE OF IOWA, Appellant, v. CHARLES E. CAMERON et al., Appellees.

CRIMINAL LAW: Exemption from Prosecution—Performance of Governmental Functions—Nuisance. The managing officers of a public corporation, provided by statute and organized as an arm of the government, solely for public purposes, are not liable to indictment for acts done by them in the performance of exclusively governmental functions, especially where the acts were neither malicious nor wilful. So held as to a nuisance resulting from the construction by the state board of agriculture of a sewer on the state fair grounds.

*Appeal from Polk District Court.*—LAWRENCE DEGRAFF, Judge.

THURSDAY, JUNE 29, 1916.

THE indictment charges the defendants with the crime of nuisance. Trial to a jury. There was a directed verdict for the defendants, and the State appeals.—*Affirmed*.

*George Cosson*, Attorney General, and *John Fletcher*, Assistant Attorney General, for appellant.

*Clark, Byers & Hutchinson*, for appellees.

PRESTON, J.—The indictment charges that the defendants, as members of the executive committee of the state board of

agriculture, did cause and suffer offal and other nauseating
substances to be discharged into an open ditch
from a sewer emptying out of the state fair
grounds, the same being injurious to the
public health, and did then and there render
impure and unwholesome the water in said

CRIMINAL LAW: exemption from prosecution: performance of governmental functions: nuisance.

open ditch.   The defendants interposed a demurrer, which
was overruled.   Evidence was then introduced, and defend-
ants' motion for a directed verdict was sustained.   The
motion was upon the following grounds, among others:

"Third:   It appears upon the face of the indictment and
from the evidence introduced by the State that the defendants
named in the indictment did not commit the offense charged,
or any other offense known to the statutes of this state.
Fourth:   It appears beyond question, and without dispute,
that the defendants, Cameron and Olson, are members of the
state board of agriculture, a board which represents and is
the department of agriculture of the state of Iowa,—in other
words, an agency and arm of the state itself; and it appears
from the evidence and the record so far without dispute that,
whatever these gentlemen did with respect to the fair of 1913
and 1914, was done as representatives and agents of the state
of Iowa, and in performance of duties enjoined upon them by
law.   It does not appear from the evidence, either directly or
indirectly or by inference, that either of the defendants per-
sonally, or in any other way, took part in creating, maintain-
ing or causing the alleged nuisance charged in the indictment.
It further appears without dispute that the state board of
agriculture, made up of the several members named by the
witness for the state, Mr. Corey, has absolute control and
supervision for the state of Iowa over the state fair grounds,
and the management and control and supervision of the hold-
ing of state fairs and exhibitions; and whatever was done by
these defendants was done as members of that board and as
a committee duly and properly provided for in the statute,
and that such duties and powers as were enjoined upon them

were carried out in their capacity as officers of the state.''

The defendants, Cameron and Olson, are, respectively, the president and vice-president of the state board of agriculture, and they, with the secretary, constitute the executive committee of the board. The statutes provide for the reorganization of what was formerly the state agricultural society, and that the governor, the president of the state college of agriculture, the state dairy and food commissioner and the state veterinarian shall, by virtue of their offices, be members of the board. This executive committee, and one director elected from each congressional district in the state, constitute the managing body of the Iowa state fair grounds and the annual state fair.

Sometime prior to the finding of the indictment, a four-foot storm sewer was constructed through a part of the fair grounds, the sewer originating at the west part of the race course and terminating in an open ditch inside the southwest corner of the grounds. This open ditch runs on south, through or near the property occupied by some of the complaining witnesses in this case who live south of the fair grounds, and continues on to the Des Moines River, a distance of a mile or two. It was claimed by the State, upon the trial of the case, that this storm sewer carried flush water from the toilets, and other offal, from the fair grounds; and that the odor from the open ditch into which the sewer drained was obnoxious and injurious to the health of the public; and that the construction and maintenance of the sewer constituted a nuisance for which the defendants were criminally liable. During the holding of the fair in the year when it is claimed the nuisance was created and maintained, there were two or three extraordinary rainstorms, flooding the grounds, and appellees claim that the overflow of the toilets was the cause, in part at least, of the nuisance complained of.

The state fair grounds occupy 283⅓ acres in the city of Des Moines. Substantially all the tract upon which the state fair is held and the fair ground buildings are located, slopes

to the west and south, the natural drainage of the ground
being west and south to the Des Moines River. The state fair
is an annual event, lasting from 4 to 6 days, during which
time several hundred thousand people visit the fair. The rec-
ord shows that, during one of the years in question, the attend-
ance was 280,000. It is claimed that sanitation and drainage
have been an important question to the state board for many
years, and the necessity for a sewerage system increased as
the attendance at the fair increased. It appears that the
sewer in question was intended largely to take care of surface
water, and to form a part of a complete sewerage system
which the board intended to have constructed whenever the
proper appropriation was made by the legislature. It is con-
ceded by appellees that the water, rubbish and offal flowing
into the ditch, and then on into the river, caused disagreeable
conditions. The State's claim, substantially, is that defend-
ants were responsible for the fact that flush water from the
toilets and other offal from the fair grounds was carried
through the storm sewer into the ditch, and then down the
ditch into the river.

The statute provides for the annual meetings of the
society, the election of officers and directors, and the duties
of the board. See Sections 1657-b-c-d-e-f-g of the Supple-
ment to the Code, 1913; also Section 1657-h, which provides,
in substance, that the president, vice-president and secretary
shall constitute the executive committee, which shall transact
such business as may be delegated to it by the board of agri-
culture, and that the president may call meetings of the board
when the business of the department requires. Section 1657-i
provides for the holding of the annual state fair, and gives
the board of directors the control of the state fair grounds
and improvements thereon, and the power to hold annual fairs
and exhibits, consisting of the productive resources and indus-
tries of the state, and authorizes them to prescribe necessary
rules and regulations for caring for the grounds and improve-
ments, and that the expenses and per diem of the managers

of the fair shall be paid from the state fair receipts. Section 1657-q provides for an examination of the financial business of the departments by the state accountant, and requires that officer to report the condition to the executive council. Section 1657-t provides for annual appropriations for the support of the office of the department of agriculture, and for the insurance and improvement of the buildings on the state fair grounds. It is also provided by statute that certain money shall be distributed to farmers' institutes and the like, upon order of the state board of agriculture.

It is conceded by the State, from the statutory provisions before referred to, that the state board of agriculture is a public corporation, provided for by statute and organized solely for public purposes, and that it is an arm or agency of the state upon which is enjoined the duty of carrying on a public enterprise for the benefit of the people of the state; that no local or private interests are subserved by the organization; and the State says further that the officers of the executive committee, in conducting the annual fair and in making the improvements upon the grounds owned by the state, are exercising governmental functions as state officers, and that the clear weight of authority is to that effect, and they cite: *Hern v. Iowa State Agricultural Society,* 91 Iowa 97; *Melvin v. State,* 121 Cal. 16; *Minear v. State Board of Agriculture,* 259 Ill. 549; *Berman v. Minnesota State Agricultural Society,* 93 Minn. 125 (100 N. W. 732); *Berman v. Cosgrove,* 95 Minn. 353 (104 N. W. 534); *Morrison v. MacLaren* (Wis.), 152 N. W. 475.

The cases before cited, or some of them, are the cases relied upon by the defendants. Counsel for the State also concede that cases holding a contrary view are where the organization of the corporation embraces, in addition to the performance of a governmental function, private rights and interests, and that there is an exception to the rule in cases of municipal corporations. The State further concedes in the printed argument, after careful examination of the cases, that

the state board of agriculture, acting through its executive committee in the construction of improvements by way of bettering the sanitary conditions of the fair grounds, was performing a governmental function, and that the individual officers who had charge of the construction of the work would be exempt from civil or criminal prosecution, unless, as the State claims, what they did in connection with the work was beyond the power conferred upon them by law or proper authority, and was done in an unlawful manner, and that the first proposition must be determined in favor of defendants. But they contend that, if defendants constructed a ditch or sewer through which passed substances that were injurious to the health of individuals through whose property and by whose homes the ditch was constructed, someone should be held accountable; and that, if the defendants in this case constructed a sewer without regard to the property rights and without regard to the health and welfare of private individuals, there has been an invasion of the rights of individuals which the law will redress; in other words, that, although the defendants were acting within the scope of an authority given them by law, either directly or indirectly, in constructing the sewer for the proper drainage and sanitation of the fair grounds, that authority did not authorize or permit them to construct it in such manner that it would injure the person or property of citizens of the community, unless there was no manner in which the sewer could have been constructed without injury to individuals or to private property; that if, therefore, the defendants constructed the sewer without regard to the rights of individuals, when it could have been constructed in some way so as not to injure people in their health, defendants acted in a negligent and unlawful manner, and they should be subject to punishment for their acts.

It seems to us that the State is here seeking to invoke the rule applicable to individuals. Or it must be that their claim is bottomed on the thought that the failure of defendants to

act was wilful or malicious. The argument is that "malicious" has been construed to mean a wrongful act intentionally done, without just cause or excuse, and that, in the instant case, there was a wrongful act intentionally done, because it was of such a character that the result must have been known, and because, as they say, it was done without just cause, for that the sewer could have been constructed in such a manner as that it would not have resulted in injury, and that the state could afford the construction of a closed sewer from the fair grounds to the river. The only authority they cite on this branch of the case is *State v. Preston*, 34 Wis. 675, to the proposition that, where an act is done without reasonable grounds to believe that it is lawful, it may be said to have been wilfully done for the purpose of injuring another.

We are unable to discover any evidence in the record showing that the defendants acted either maliciously or wilfully. The most that could be claimed would be that, had the acts been done by an individual or a corporation other than one of the character in question, there was negligence or a failure to provide adequate sewerage. The defendants, as members of the executive committee, were acting for the board, and this committee was the board. At a prior time, the sewer had been built under proper authority, and it was found inadequate. The record does not show any authority from the board or from the legislature for the further expenditure of moneys by these defendants to repair or rebuild the sewer in question, or a new one. The nuisance was not caused by an affirmative act of these defendants, and the most that could be said was that there was mere inaction on their part. The defendants would not, of course, be required to personally rebuild or repair this sewer or build a new one.

Under the sections of the statute before quoted, and under the authority of *Hern v. Agricultural Society*, 91 Iowa 97, 98, the state board of agriculture is an arm or agency of the state. The instant case involves the same society, under the

old name of Iowa State Agricultural Society, and in the *Hern* case, supra, it was said:

"The only question for us to determine is as to the liability of the society for the acts complained of; and at the outset it is important to have in mind that the society is in no sense a corporation for pecuniary profit. It is an agency of the state. It exists for the sole purpose of promoting the public interest in the business of agriculture. Its public character more fully appears when we consider that its organization is provided for by statute; that it has no stockholders; that by law the president of each county agricultural society in the state, or other delegate therefrom, duly authorized, is made a member of the board of directors; that said board is required to make annual reports to the governor, which are to be distributed throughout the state; that the powers of the board are prescribed by statute. Code, Sections 1103–1108, 1114–1116, inclusive."

It is further said in that case that, the defendant not being a corporation for pecuniary profit, the defendant society's liability is not controlled by the rules of law applicable to such. The society is an arm or agency of the state, organized for the promotion of the public good and for the advancement of the agricultural interests of the state. As stated, the defendants, as members of the executive committee, were acting for and in place of the state board of agriculture. The state board being an agency of the state, the members of the board, while in the discharge of their duties as such members, stand in the place of the state, and their action is the action of the state. See *Lane v. Minnesota State Society,* 62 Minn. 175 (29 L. R. A. 708), in which case the court held:

"The state may and must commit the discharge of its sovereign political functions to agencies selected by it for that purpose. Such agencies, while engaged exclusively in the discharge of such public duties, do not act in any private capacity, but stand in the place of the state, and exercise its political authority. Therefore, when the state creates public

corporations solely for governmental purposes, such corpora-tions, while engaged in the discharge of the duties imposed upon them for the sole benefit of the public, and from the performance of which they derive no compensation or benefit in their corporate capacity, are clothed with the immunities and privileges of the state; and no private action, in the absence of an express statute to that effect, can be maintained against them for negligence in the discharge of such duties."

See, also, the following cases, in addition to those already cited: *Maia v. Eastern State Hospital,* 97 Va. 507 (34 S. E. 617, 47 L. R. A. 577); *White v. Alabama Insane Hospital,* 138 Ala. 479 (35 So. 454); *Leavell v. Western Kentucky Asylum,* 122 Ky. 213 (91 S. W. 671, 4 L. R. A. [N. S.] 269); *Ketterer v. State Board of Control,* 131 Ky. 287 (115 S. W. 200, 20 L. R. A. [N. S.] 274); *Riddoch v. State,* 68 Wash. 329 (123 Pac. 450, 42 L. R. A. [N. S.] 251).

Our conclusion is that the judgment of the lower court was right and in accordance with law, and it ought to be, and it is,—*Affirmed.*

EVANS, C. J., DEEMER and LADD, JJ., concur.